**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| **JILL THOMPSON,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | )     **Civil Action No.  03-2227 (ESH)** |
|  | ) |
| **DEPARTMENT OF STATE,** | ) |
|  | ) |
| **Defendant.** | ) |
_____ )

## MEMORANDUM OPINION[1/]

Plaintiff is employed as a Foreign Service Officer for the Department of State ("the

Department").  She claims that her employer violated the Privacy Act, 5 U.S.C. § 552a *et seq.*,

while investigating allegations that plaintiff's supervisor had promoted her career to the

detriment of others as a result of his romantic involvement with her.  The parties have cross-

moved for summary judgment.  For the reasons set forth below, the Court concludes that

defendant's motion for summary judgment should be granted and plaintiff's cross-motion should

be denied.

## BACKGROUND

Plaintiff worked in the Office of International Financial Services ("IFS") within the

Bureau of Financial Management Policy ("FMP") on a two-year tour of duty starting October 16,

2000.  (Def.'s Resp. to Pl.'s Rule 7(h) St. ["Def.'s Resp."] ¶¶ 1-2.)  Beginning in early 2001, two

---

[1/]This opinion and its accompanying order were originally issued under seal on August
31, 2005.  The opinion has been redacted as requested by the parties.  The deadline for filing an
appeal runs from the date of the original opinion and order, not today's date.

co-workers in IFS began complaining to FMP senior management that plaintiff and her

supervisor were romantically involved and that this relationship was having an adverse impact on

the office.  According to these employees, the supervisor was transferring work assignments from

one of them to plaintiff and singling plaintiff out for other benefits, such as assigning her to be

supervisor over the complaining employees and giving her an office instead of a cubicle.  (Def.'s

Resp. ¶ 7; *see* Def.'s Mot., Ex. 3 (Report of Investigation) ["ROI"] at 2-4, 8-9.)  They also

alleged that the supervisor became hostile towards anyone who expressed disagreement with

plaintiff and that his relationship with plaintiff otherwise contributed to the office's

dysfunctionality.  For instance, one coworker claimed that the time that plaintiff and her

supervisor spent together both in and out of the office made it difficult to approach either of them

with questions.  Because both would "disappear incommunicado from the office . . .[,]  no one

knew what time key issues and meetings were occurring."  (*See* ROI at 9.)  Further, the

allegations suggested that plaintiff's supervisor had used federal funds to accompany plaintiff on

business trips for personal reasons.  (*See id.* at 3, 10.)[2]

In response to these allegations and based on the advice of the Office of Diplomatic

Security ("DS"), the Bureau of Human Resources ("HR"), and other offices within the

Department, the FMP Executive Office initiated an inquiry in August or September 2001.

(Def.'s Resp. ¶¶ 8-9.)  The Executive Director of FMP, William Todd, and a human resources

specialist, Helen Driver, reviewed e-mail messages that had been retrieved from the supervisor's

---

[2]Unsure whether FMP would address their concerns, the employees also took their complaints to other units within the Department, including the Office of Civil Rights ("OCR"). OCR resolved their complaints informally and neither employee ever filed a formal complaint of discrimination or harassment.

office mailbox, solicited written memoranda from the two coworkers who had initially complained (*see* Def.'s Mot., Ex. 1 [Coworker 1 Mem.]; Pl.'s Reply, Ex. 14 [Coworker 2 Mem.]), and questioned another employee about personal photographs plaintiff had allegedly sent her supervisor at the office.  (*See* Def.'s Mot., Ex. 4 ["Driver Dep."] at 64-65.)  Todd soon halted this inquiry in response to the supervisor's demands that it be conducted by an independent office.

DS agreed to resume the investigation following discussions involving HR, the Office of Civil Rights ("OCR") and the Inspector General's Office, and at the specific request of OCR Director Barbara Pope.[3/]  (*See* Def.'s Mot, Ex. 5 ["Rolph-O'Donnell Dep."] at 23; Pl.'s Opp'n, Ex. 12 ["Pope Dep."] at 20.)  DS assigned the investigation to Special Agent Thomas Scanlon, who began his interviews in October 2001.  (Def.'s Resp. ¶ 19.)  The investigation concerned whether plaintiff and her supervisor were in fact romantically involved, how their relationship had impacted the work environment, and whether they had conspired to promote plaintiff's career at the expense of others in the office.  (*See* ROI at 1.)   Although plaintiff was not originally a subject of the investigation, Scanlon added her as a subject when information surfaced suggesting that she may have collaborated with her supervisor to obtain the work responsibilities of other employees.  (Scanlon Dep. at 33-34.)

At the time the DS investigation began in early October, plaintiff was on medical leave

---

[3/]DS has responsibility for investigating employee misconduct and  "suitability" for security clearance, including "workplace violence cases, sexual harassment cases, misuse or mishandling of classified information . . .  misuse of government vehicles," and other violations of State Department regulations.  (Def.'s Mot., Ex. 6 ["Scanlon Dep."] at 9-10.)

due to a brain hemorrhage.[4]  Upon plaintiff's return to work in November 2001, Pope arranged

for plaintiff to be placed on a two-week detail in the HR Executive Office rather than returning to

IFS.  (Def.'s Resp. ¶¶ 15-16; Pl.'s Opp'n, Ex. 13.)  According to defendant, the detail was

arranged to ensure the integrity of the investigation and to respond to plaintiff's complaints that

the atmosphere in IFS was so stressful as to pose a threat to her health.  (Def.'s Reply at 24.)

Plaintiff disputes this explanation, claiming that the detail was merely a "pretext to dispense with

Plaintiff and leave her without a job," as evidenced by its duration of over three months instead

of the intended two weeks.[5]  (Pl.'s Reply at 17.)

   During the investigation, Scanlon reviewed the two complaining employees' statements

and e-mail messages between plaintiff and her supervisor (Def.'s Mot., Ex. 8) and interviewed 15

witnesses.  (*See* ROI at 1-35.)  After completing all witness interviews, Scanlon interviewed

plaintiff in the company of her lawyer on November 26, 2001.  (*Id.* at 36.)  Scanlon provided

plaintiff with a "Warning and Assurance" form at the beginning of the interview, which she

executed.  (*See* Scanlon Dep. at 36; Def.'s Mot., Ex. 7.)  The investigation concluded on

December 6, 2001, with the issuance of a 75-page ROI, which contained tentative findings and

two separate binders of supporting documents.  (Def.'s Resp. ¶ 46.)  The ROI concluded that

"[b]ased on E-mails and employee interviews there [was] a strong likelihood that [plaintiff and

her supervisor] had a relationship, which negatively impacted the office and other employees."

(ROI at 74.)

_____

   [4]Defendant disputes whether plaintiff in fact suffered a brain hemorrhage (*see* Def.'s
Reply, Ex. 2), but this dispute is immaterial.

   [5]Plaintiff alleges that she did not obtain a permanent position or formalized work
requirements for approximately seven months.  (Second Am. Compl. ¶ 28.)

At the conclusion of the investigation, FMP provided a copy of the ROI to OCR.  (Def.'s

Resp. ¶ 55; ROI cover page.)  Plaintiff alleges that the ROI or other information concerning the

investigation was also placed in her security file.  (*See* Pl.'s Rule 7(h) St. ¶ 68 (claiming she was

questioned about the investigation in her security update interview).)  Finally, DS also forwarded

a copy of the ROI to the Foreign Service Grievance Board ("FSGB") for adjudication of a

grievance filed by plaintiff (*id*. ¶ 65), since the report itself was one of the issues raised by

plaintiff in her grievance.  (*See* Pl.'s Opp'n, Ex. 4 ["FSGB Op."] at 27 ("Grievant contends the

ROI is riddled with errors, misrepresentations and prejudicial information.").)

On April 22, 2002, HR proposed to suspend plaintiff for three workdays without pay for

allegedly making false or misleading statements during the DS investigation.  (Def.'s Mot., Ex.

10.)  After consultation with plaintiff and review of her written response to the disciplinary letter,

HR mitigated this sanction to a Letter of Admonishment for an "inappropriate . . . volume of e-

mails . . . that at best could be viewed as suggestive in tone."  (Def.'s Mot., Ex 12 at 1.)  This

letter was to be maintained by the Office of Employee Relations for one year.  (*Id.* at 2.)

State Department regulations require that all employees shall "[s]ee that personal

information about individuals is properly safeguarded and protected from unauthorized

disclosure, *e.g.*, use of locked file cabinet, password protected systems."  (Pl.'s Reply, Ex. 19 (5

Foreign Affairs Manual ("FAM") § 462(a)(7)).)  Despite these practices, plaintiff found that the

suspension letter and a copy of the ROI, both in a sealed envelope, along with two binders

containing attachments to the ROI, had been left on her cubicle chair while she was out of the

office on vacation.  (Pl.'s Opp'n, Ex. 26 ["Thompson Dep."] at 174-75.)  Although defendant

claims that plaintiff consented to the delivery to her empty cubicle, plaintiff disputes this

statement.  (*See id.*; Def.'s Mot., Ex. 13 ["Coviello Decl."] ¶ 5.)

During the investigation, plaintiff was suffering from ongoing health problems.  Letters

from her doctors requested that her office make all necessary efforts to shield her from stressful

situations that might aggravate her physical condition.[6]  (*See, e.g.,* Def.'s Reply, Ex. 4; Pl.'s

Opp'n, Ex. 17.) According to defendant, the Department became concerned as a result of these

communications that plaintiff's medical problems (particularly her inability to handle stress)

would impact her eligibility for security clearance.  As a result, defendant responded to plaintiff's

neurologist, Dr. Sam Oraee, with a request that he send additional, detailed medical information

to Dr. Athena Moundalexis at the Department.  (Pl.'s Opp'n, Ex. 20 ["Def.'s Resp. to

Interrogatories"] No. 8.)   Defendant solicited this information directly from Dr. Oraee without

plaintiff's knowledge or consent.  (*See id.*, Ex. 19 (Letter from Caron A. McConnon, Chief,

Personnel Security/Suitability Division, DS to Dr. Sam Oraee, Dec. 7, 2001) ["McConnon

Letter"].)  The record is unclear as to whether Dr. Oraee ever provided the requested information

to the Department.  Although plaintiff presents an envelope addressed to Dr. Moundalexis from

Dr. Oraee (*id.*, Ex. 22 (postmarked Dec. 22, 2001)), she also told her lawyer upon her discovery

of the letter, that Dr. Oraee "did not respond because to do so would have violated doctor-patient

confidentiality."  (*Id.*, Ex. 49.)  Plaintiff discovered the McConnon letter in her doctor's files

while seeking medical information to apply for a "reasonable accommodation" in early 2002.

(*Id.*, Ex. 46 ["Thompson Aff."] ¶ 3.)  She asserts that this discovery triggered the onset of anxiety

attacks and a compulsive hair-pulling disorder (*i.e.*, trichotillomania) because she concluded that

---

[6]In another lawsuit in this Court, plaintiff claims that her health problems amount to a "disability," which her employer has failed to accommodate as required by the Rehabilitation Act.  *See Thompson v. Powell*, Civ. No. 03-2022 (D.D.C.) (JDB).

defendant was "seeking a pretext to end her foreign service career."  (*Id*.)

Plaintiff also claims a link between her medical and emotional problems and other alleged violations of the Privacy Act.  She submits medical evidence from a psychiatrist who attributes the psychological impact and plaintiff's severe pain and suffering to "what she perceives to be the deliberate infliction of stressful, coercive, and inhuman treatment by officials and employees at the [Department]."  (Def.'s Mot., Ex. 22 ["Crowley Report"] at 4.)  The expert further opines that plaintiff's "physical symptoms which began in 2002 (panic attacks, heart palpitations, disorientation, alopecia, trichotillomania) are . . . causally connected to her fear and prolonged anguish over what she regards as the government's betrayal of her safety and her belief that the State Department treated her with deliberate cruelty in a malevolent planned assault."  (*Id*.)

Plaintiff seeks damages for seven alleged violations of the Privacy Act:  (1) collecting information about plaintiff from third parties when it was practicable to collect it from her in violation of subsection (e)(2); (2) failing to properly warn plaintiff before interviewing her in violation of subsection (e)(3); (3) maintaining information about plaintiff that is not necessary to accomplish a purpose of the agency in violation of subsection (e)(1); (4) maintaining inaccurate records that resulted in an adverse determination against plaintiff in violation of subsection (e)(5); (5) disclosing records about the plaintiff to the OCR Director, Barbara Pope, who did not need the record for her duties in violation of subsection (b)(1); (6) disseminating an inaccurate record about plaintiff to the FSGB in violation of subsection (e)(6); and (7) failing to establish appropriate safeguards to ensure the privacy of records concerning plaintiff in violation of subsection (e)(10).  Both parties have moved for summary judgment on all counts.

## ANALYSIS

### I.    Legal Standard

Under Fed. R. Civ. P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id*. at 255; *see also Wash. Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).  The Court "must assume the truth of all statements proffered by the party opposing summary judgment," except for wholly conclusory statements unsupported by any competent evidence. *Greene v. Dalton*, 164 F.3d 671, 674-75 (D.C. Cir. 1999); *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 73 (D.D.C. 2002).

### II.    Privacy Act Causes of Action Generally

Plaintiff seeks monetary damages for seven purported violations of the Privacy Act

- 8 -

pursuant to 5 U.S.C. § 552a(g)(1)(C)-(D).  To obtain damages under either subsection, plaintiff

must prove that the agency's conduct was "intentional or willful."  5 U.S.C. § 552a(g)(4).  Proof

of "actual damages" is also required in order to recover either the statutory minimum of $1,000

or damages in excess of that amount.  *See id*.; *Doe v. Chao*, 540 U.S. 614, 618 (2004).

Subsection (g)(1)(C) concerns the accuracy of records and provides a cause of action

against a federal agency that maintains a system of records when it "fails to maintain any

record . . . with such accuracy . . . and completeness as is necessary to assure fairness . . . and

consequently a determination is made which is adverse to the individual."  5 U.S.C.

§ 552a(g)(1)(C).  This subsection provides the exclusive damages remedy for violations of

subsection (e)(5), which requires an agency to "maintain all records which are used by the agency

in making any determination about any individual with such accuracy, relevance, timeliness, and

completeness as is reasonably necessary to assure fairness to the individual in the determination."

*See Doe v. United States*, 821 F.2d 694, 697 n.8 (D.C. Cir. 1987) (en banc) (noting that the

standard in subsection (e)(5) is reiterated in (g)(1)(C)); *Deters v. United States Parole Comm'n*,

85 F.3d 655, 660-61 & n.5 (D.C. Cir. 1996) (requiring suit under subsection (g)(1)(C), not

(g)(1)(D), for violation of subsection (e)(5)).  Thus, under subsection (g)(1)(C), a plaintiff must

establish "inaccurate records, agency intent, proximate causation, and an 'adverse

determination.'"  *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 583 (D.C. Cir. 2002).

Subsection (g)(1)(D) is a residual cause of action for damages that covers any other

violation of the Privacy Act and requires a plaintiff to prove that the agency failed to comply "in

such a way as to have an adverse effect on [the plaintiff]."  5 U.S.C. § 552a(g)(1)(D).  Therefore,

under subsection (g)(1)(D), a plaintiff must establish: (1) a violation of a Privacy Act provision,

"(2) that the [agency's] decision . . . was 'intentional or willful,' (3) that the [violation] caused

'adverse effects,' and (4) that the plaintiff[] suffered actual damages." *Albright v. United States*,

732 F.2d 181, 184 (D.C. Cir. 1984).

**III.     Collection of Information -- Subsection (e)(2)**

Subsection (e)(2) of the Privacy Act requires federal agencies that maintain systems of

records to "collect information to the greatest extent practicable directly from the subject

individual when the information may result in adverse determinations about an individual's

rights, benefits, and privileges under Federal programs." 5 U.S.C. § 552a(e)(2).  Plaintiff alleges

that defendant violated subsection (e)(2) by: (1) interviewing other employees before

interviewing plaintiff during the FMP and DS investigations and (2) soliciting plaintiff's medical

information directly from her neurologist rather than requesting it from her.  She argues, and the

Court agrees, that the information in both circumstances could have resulted in "an adverse

determination" about plaintiff's "rights, benefits, and privileges," thereby triggering the agency's

(e)(2) obligation.  *Id*.  The information gathered in the investigations in fact led to disciplinary

action (*see* Def.'s Mot., Exs. 10, 12), and DS requested the medical information explicitly to

make a determination as to plaintiff's suitability for a security clearance (*see* McConnon Letter at

1).  Thus, the issue for the Court is whether the agency collected information "to the greatest

extent practicable" directly from plaintiff.  5 U.S.C. § 552a(e)(2).

Subsection (e)(2) was designed to "'discourage the collection of personal information

from third party sources and therefore to encourage the accuracy of Federal data gathering.'"

*Waters v. Thornburgh*, 888 F.2d 870, 874 (D.C. Cir. 1989) (quoting *Analysis of House and

Senate Compromise Amendments to the Federal Privacy Act*, 120 Cong. Rec. 40,405, 40,407

(1974) [hereinafter "*Staff Analysis*"]).  "It reflects congressional judgment that the best way to ensure accuracy in general is to require the agency to obtain information 'directly from the individual whenever practicable.'"  *Id*. (quoting Office of Management and Budget Privacy Act Guidelines, 40 Fed. Reg. 28,949, 28,961 (July 9, 1975) (hereinafter "OMB Guidelines")).  "It supports 'the principle that an individual should to the greatest extent possible be in control of information about him which is given to the government . . . a principle designed to insure fairness in information collection which should be instituted wherever possible."  *Waters*, 888 F.2d at 875 (quoting *Staff Analysis*, 120 Cong. Rec. at 40,407).

       The two leading D.C. Circuit cases demonstrate that courts must weigh the interests of both accuracy and privacy in determining whether an (e)(2) violation has occurred.  In *Waters v. Thornburgh*, the agency sought verification of Waters' claim that he was absent from work because he was taking a bar exam and contacted the bar examiners for proof of attendance rather than asking Waters himself.  The Court found that obtaining the information first from Waters would not have compromised the accuracy of the information because Waters could not "falsify or secrete evidence having to do with his attendance," nor could he "exert pressure over the bar authorities to force them to alter their responses."  *Id*. at 874.  Additionally, because the agency sought "objective, unalterable information," the accuracy of the information could not be undermined by the "justifiable grounds for doubting [Waters'] credibility."  *Id*. at 873.  Finally, as Waters held objective proof of his bar attendance that would have obviated the need to contact the bar examiners, the agency could have achieved its goals while allowing Waters to remain "in control" of information provided to the government.  *Id*. at 875.  Thus, the Court held that the agency had violated subsection (e)(2) because both privacy and accuracy concerns "could have

been optimally satisfied" by obtaining the information directly from Waters.  *Id*. at 875.

In contrast, in *Brune v. IRS*, the Court found that it was not practicable to obtain the information directly from the IRS agent who was under investigation for misconduct.  861 F.2d 1284, 1287 (D.C. Cir. 1988).  The agency, suspecting false statements on Brune's travel vouchers, contacted the taxpayers whom he had visited to inquire about the frequency and duration of those visits.  The Court concluded that the agency could have reasonably inferred that Brune would be in a position to intimidate and bias the taxpayers, and thus, there was "much to lose (in terms of ascertaining the truth)" by contacting Brune first.  *See id*. at 1287.  Further, as "[t]he probability that, when confronted, [Brune would] advance an explanation . . . sufficient to obviate the need to contact third parties [wa]s minimal," there was "nothing to gain []by way of protecting the suspect's privacy."  *Id*.  *See also Cardamone v. Cohen*, 241 F.3d 520, 527-28 (6th Cir. 2001) (finding it impracticable to interview plaintiff first with respect to allegations of retaliation and mistreatment of employees because of "practical concerns" that he would "threat[en] and intimidat[e] fellow co-workers"; interviewing 61 witnesses prior to Cardamone was not improper); *Carlton v. Reno*, 310 F.3d 108, 112 (2d Cir. 2002) (allegations of abusive conduct could not be resolved by speaking with plaintiff first).

### A.      Investigation

Plaintiff contends that it would have been "practicable" for Scanlon to resolve the investigation by approaching her first instead of interviewing 15 other employees because "objective proof" existed to rebut the allegations.[7]  (Pl.'s Reply at 7.)  She also argues that cases

---

[7]For example, plaintiff states that she could have informed Scanlon that her office space was approved by a former supervisor, Ron Miller.  (Pl.'s Reply at 8 n.7; *see* ROI at 47.)

such as *Brune* and *Cardamone* are distinguishable because no one had accused her of "abusive [or] . . . untruthful" conduct.  (*Id.* at 8.)  *See Dong v. Smithsonian*, 943 F. Supp. 69, 73 (D.D.C. 1996) (that defendant had no reason to fear that plaintiff "would tamper with, falsify, or secrete evidence, or coerce or pressure any witnesses into giving false testimony" weighed against defendant's claim that it was impracticable to contact plaintiff first), *rev'd on other grounds*, 125 F.3d 877 (D.C. Cir. 1997) (Smithsonian is not an "agency" for purposes of the Privacy Act). Defendant disagrees that FMP or DS could have wholly dismissed the allegations based on objective evidence and argues that, even if such evidence existed, it was not practicable to parse its investigation according to the type of information sought.[8/]  (Def.'s Mot. at 16.)

This case is not exactly akin to either *Brune* or *Waters.*  While the issues under investigation could not have been resolved merely by plaintiff's say-so or by evidence as straightforward and "unalterable" as the proof-of-attendance slip in *Waters*, DS had little reason to fear that plaintiff would threaten or intimidate witnesses as in *Brune*.  And, though much of the investigation involved "subjective" evidence that could be obtained only from third parties, some questions might have been resolved by objective "documentation."  (*See* Pl.'s Opp'n at 15; Pl.'s Reply at 8 n.7.)  The nature of the investigation was also particularly intimate, heightening concerns about the solicitation of information from third parties.  Seeking interviews regarding an alleged extra-marital affair from no fewer than 15 other employees (most of whom had only heard "rumors" prior to the interview (*see*, *e.g.*, ROI at 13,16)) naturally raises more serious privacy concerns than an investigation into false statements on travel vouchers.

---

[8/] Defendant also argues that plaintiff's claim must fail because she has not shown that defendant acted with the level of intent required under subsection (g)(1)(D). However, the Court's resolution of the practicability issue makes it unnecessary to reach the issue of intent.

Despite the complexities which make this case more challenging than *Brune*, the Court concludes that defendant sought information directly from plaintiff "to the extent practicable" as required by §552a(e)(2), for the issues raised by plaintiff's coworkers were far from resolvable by "objective evidence" in plaintiff's possession.  The allegations centered on the manner in which projects were assigned, the supervisor's hostile attitude towards employees other than Thompson, the need for both Thompson and her supervisor to travel to the same business meetings, the perception of favoritism, and many other issues that plaintiff's co-workers were uniquely qualified to address.  For example, one coworker alleged that "disagreement with Ms. Thompson would not be tolerated" by her supervisor.  (Coworker 1 Mem. at 2.)  Plaintiff could not have satisfactorily confirmed or denied this allegation.  Even plaintiff acknowledges that interviewing other employees was necessary to the investigation.  (Pl.'s Opp'n at 16 ("no one has ever suggested that the DS should have relied 'solely' on the word of [her supervisor] or Plaintiff or on documentation alone to resolve the issues raised."))  The order of interviews therefore would not have altered the investigation's impact on plaintiff's reputation.  If it is "impracticable" to seek information directly from an employee, some tarnishing of the employee's reputation may be inevitable.  *See, e.g.*, *Brune*, 861 F.2d at 1287-88.

Moreover, as defendant correctly argues, subsection (e)(2) does not require the agency to undertake a piecemeal investigation according to the type of information it is seeking.  *See Cardamone*, 241 F.3d at 529 (Privacy Act does not require an agency "to divide its investigation piecemeal into the allegations that could possibly be resolved by objective information, and approach [the subject] first as to those claims, and then to interview third-party witnesses as to the more subjective claims.")  Thus, the fact that objective evidence could have rebutted *some* of

the allegations against plaintiff does not mean it would have been practicable for the agency to

seek information from her first.

Nor has plaintiff presented evidence that approaching her at the outset would have

allowed the agency to better "ascertain[] the truth." *Waters*, 888 F.2d at 875. (*See* Pl.'s Reply at

8, n.7 (listing "objective, unalterable facts which could have been disposed of at the outset of the

investigation," but failing to cite any evidence to support this claim).) As in *Carlton*:

> There is no reason to think that information of greater extent could have been
> collected from [plaintiff] if [s]he had been interviewed first rather than last. To
> the contrary, it may be expected that the interviews with the complainants and
> others would sharpen the issues and focus the charges in a way that would allow
> [plaintiff] to respond more particularly, and that this sequence would serve h[er]
> interests as well as the interests of a fair investigation.

*Id.* at 112. Furthermore, both plaintiff and her supervisor had emphatically denied their

colleagues' allegations prior to any inquiry. (*See, e.g.*, Def.'s Mot., Ex. 2 ["Todd Dep."] at 42

("We have [both plaintiff and her supervisor] . . . saying this is totally false. It's totally out of

bounds."); ROI at 30, 35; FSGB Op. at 26.) Thus, the agency already had plaintiff's version of

some of the key facts before it sought information from other employees.

Lastly, although FMP did not inform plaintiff about the allegations during its initial

inquiry, DS gave her an opportunity to respond to each specific charge raised against her during

her interview with Scanlon (*see* ROI at 37-49), as well as "the opportunity to add anything she

felt was relevant" at its conclusion (*id*. at 49) and offered her a second interview at the end of the

investigation, which she declined.[9] (*Id.* at 50.) *See* OMB Guidelines, 40 Fed. Reg. at 28,961

---

[9]Plaintiff's claim that Scanlon did not give her an opportunity to respond to the details of
each allegation against her is inapposite. (*See* Pl.'s Opp'n at 16.) Subsection (e)(2) does not
entitle plaintiff to a line-by-line rebuttal of the ROI.

(including "provisions for verifying the third-party information with the [subject] individual"

once the agency determines it is not practicable to seek information directly from the subject as

factor in determining obligations under subsection (e)(2)).

In sum, subsection (e)(2) does not address the appropriate scope of an inquiry, but rather

how an agency collects the information it deems necessary to gather.  Therefore, the Court

concludes that the Department's conduct did not contravene subsection (e)(2)'s twin concerns of

accuracy and privacy despite the sensitive nature of the investigation.

### B.    Medical Information

Plaintiff next claims that the Department's solicitation of medical information directly

from her neurologist, Dr. Oraee, violated subsection (e)(2).  Again, she fails to defeat summary

judgment.

### 1.  Maintenance of Records

The first shortcoming in plaintiff's argument is that she provides only the barest of proof

(an empty envelope) that the agency ever received the requested records and, contradicting

herself, provides affirmative evidence that it did not.  (*See* Pl.s' Opp'n, Exs. 22 (envelope) and

49 (e-mail from plaintiff to her attorney stating that "[Dr. Oraee] did not respond [to the

McConnon letter] because to do so would have violated doctor-patient confidentiality.").)[10]  It is

not at all clear that subsection (e)(2), which covers "[e]ach agency that maintains a system of

records," 5 U.S.C. § 552a(e), applies where the requested information never becomes part of this

system.  Indeed, the D.C. Circuit recently found in *Maydak v. United States*, 363 F.3d 512 (D.C.

Cir. 2004), that it does not.  The court reasoned, "if [subsection (e)(2), among others,] trigger[s]

─────────────

[10]Defendant does not address whether it in fact received the records in question.

Privacy Act requirements even when the records are not maintained in a system of records, agencies may be liable for Privacy Act violations simply by collecting records that they immediately discard after finding the records neither relevant nor necessary." *Id.* at 519.  The Court distinguished *Albright v. United States*, 631 F.2d 915 (D.C. Cir. 1980), in which it had previously noted congressional concern for the "'unwarranted collection of information as a distinct harm in itself.'" *Maydak*, 363 F.3d at 518 (quoting *Albright*, 631 F.2d at 919.)  *Albright* had concerned only subsection (e)(7), which the Court found "proves the exception rather than the rule."[11]/  *Id.* at 519.  Following *Maydak*, it is difficult to see how plaintiff could prove an (e)(2) claim without evidence that the agency ever maintained the records at issue.  Even assuming that plaintiff has overcome this preliminary hurdle, she cannot show that defendants' alleged violation was intentional or willful or that it proximately caused an adverse effect.

### 2.     Intent

To obtain damages, plaintiff must demonstrate that defendant acted in a manner that was "intentional or willful."  5 U.S.C. § 552(g)(4).  The case law construing this requirement sets a high bar.  In *Laningham v. United States Navy*, for example, the Circuit held that intentional or willful means "so 'patently egregious and unlawful' that anyone undertaking the conduct should have known it 'unlawful'."  813 F.2d at 1242 (quoting *Wisdom v. Dep't of Hous. & Urban Dev.*, 713 F.2d 422, 425 (8th Cir. 1983)); *see also Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987) ("intentional or willful" conduct is "somewhat greater than gross negligence," demonstrating a "flagrant disregard" for rights the Act protects) (internal quotation omitted).

---

[11]/Subsection (e)(7) prohibits collecting records of an individual's First Amendment activity.  *See* 5 U.S.C. § 552a(e)(7).

Plaintiff cannot avoid summary judgment merely by presenting evidence that "the government handled a matter in a disjointed or confused manner, or that the government acted inadvertently to contravene the Act." *Waters*, 888 F.2d at 875-76 (internal citations and quotation omitted). Rather, summary judgment is proper where the agency presents evidence explaining its conduct and its grounds for believing its action to be lawful. *See Laningham*, 813 F.2d at 1243.

Defendant has offered evidence of several plausible reasons for why it did not contact plaintiff directly, thus defeating any claim that its conduct was in "flagrant disregard" of her rights. *Tijerina*, 821 F.2d at 799. First, it was plaintiff's doctor who made the first contact with the Department, offering unsolicited medical information on plaintiff's behalf. (*See* Def.'s Reply, Ex. 4; Pl.'s Opp'n, Ex. 17.) Thus, defendant assumed that it would be appropriate to correspond with him about her medical condition. (*See* Def.'s Reply at 7-8; Def.'s Resp. to Interrogatories, No. 8; *see also* Pl.'s Opp'n, Ex. 38 (e-mail from Dr. Moundalexis to DS staff stating that "the diagnosis and recommendations seem a bit unusual . . . I would suggest [that you] ask for [a variety of medical records] to gain more of an appreciation of the problem being faced by this patient." ) Additionally, defendant points out that plaintiff made it very clear that she did not want to be troubled by these types of requests. In fact, one of plaintiff's allegations in this lawsuit is that she should not have been subjected to an interview about personal matters. She declined a second interview when requested and continued to implore the agency not to place her in stressful situations. Given these facts, the agency's desire to avoid direct contact with plaintiff regarding matters that might upset her (such as concern about her suitability for a

security clearance) is understandable and hardly malicious.[12]   Although plaintiff speculates that

defendant is now merely covering its tracks with *post-hoc* excuses (Pl.'s Reply at 11), she has

presented no competent evidence to undercut defendants' explanations of its conduct or

affirmatively prove intent.[13]

### 3.     Causation of an Adverse Effect

Plaintiff alleges two adverse effects resulting from defendant's request for plaintiff's

medical records directly from her doctor:  (1) the possibility that the medical information could

have resulted in the revocation of her security clearance (Pl.'s Opp'n at 11; Pl.'s Reply at 10),

and (2) the triggering of her anxiety attacks and trichotillomania because she feared that

defendant was conspiring against her.  (Thompson Aff. ¶ 3).

Plaintiff essentially admits the absence of an adverse effect based on her first theory by

misstating the law.  Plaintiff states that "[n]o actual adverse determination is required under

subsection (e)(2); only the possibility of such a determination."  (Pl.'s Reply at 10 n.11.)  While

she is correct that subsection (e)(2) requires information be collected directly from plaintiff if it

"may result in adverse determinations," 5 U.S.C. § 552a(e)(2), in order to recover the monetary

damages sought under subsection (g)(1)(D) the violation must actually "have an adverse effect on

---

[12]*Dong v. Smithsonian* stated (in an opinion that was subsequently vacated) that "[c]oncern over Plaintiff's possible reaction . . . does not warrant a violation of Plaintiff's privacy interests," 943 F. Supp. at 73.  In this case, however, plaintiff affirmatively informed the agency that she needed to be left alone, whereas Dong appears to have been silent on the issue.

[13]  She points to a handwritten notation on Dr. Moundalexis' e-mail to "copy last release" (Pl.'s Opp'n, Ex. 38) as evidence that DS was "aware of the need for a release." (Pl.'s Reply at 11.)  However, this does not show that defendant intentionally circumvented its obligations under subsection (e)(2).

an individual." 5 U.S.C. § 552a(g)(1)(D).  No evidence suggests that plaintiff actually lost her

security clearance and the mere possibility of such a loss is not cognizable.

Plaintiff's argument that the alleged violation caused her anxiety disorders also lacks

support.  The Privacy Act does not protect plaintiff from all work-related emotional trauma.

Rather, plaintiff must prove a connection between the alleged violation and her emotional

distress.  For example, in *Albright* the plaintiffs asserted that their employer's alleged Privacy

Act violation-- videotaping a proceeding in which managers informed the employees of their

decision to restrict the employees' prospects for promotions and pay increases -- gave rise to the

plaintiffs' emotional distress and humiliation.  732 F.2d at 187.  The D.C. Circuit rejected this

claim because "there was little indication" that the plaintiffs' emotional trauma was due to the

videotaping rather than the adverse employment decision.  *Id.*  Similarly, in *Orekoya v. Mooney*,

330 F.3d 1 (1st Cir. 2003), the court declined to find that the alleged violation caused the

plaintiff's emotional distress where the plaintiff had also been accused of rape, suspended from

his job, and then laid off.  *Id.* at 9.  As in *Albright* and *Orekoya*, plaintiff's many other problems

at work are a "potential, and more probable, cause of the claimed injuries."  *Albright*, 732 F.2d at

188.  Plaintiff's psychiatrist attributes her emotional problems to "her fear and prolonged anguish

over what she regards as the government's betrayal of her safety and her belief that the State

Department treated her with deliberate cruelty in a malevolent planned assault during a period

when her health, if not survival, was very much at stake."  (Crowley Report at 4.)  He cites "the

stressful investigation . . . directly following her release from the hospital" and the

"displace[ment] from her position and career" as key factors.  (*Id.*)  He does not mention

plaintiff's discovery of the request for medical records, an incident that occurred five months

after the triggers he cites.[14]

Nor does plaintiff's affidavit demonstrate that her emotional distress was proximately caused by the agency's alleged (e)(2) violation.[15]   Because subsection (e)(2) governs the procedures by which agencies collect information, not the scope of the information collected, plaintiff must show that it was the Department's *manner of collecting information* that specifically led to her alleged injuries.   She has not done so here.   Instead, the evidence shows that plaintiff's anxiety resulted from her concern over the fact that the agency was seeking her medical information.   In her affidavit, plaintiff states:

> DS's alleged (e)(2) violation in contacting my neurologist without my knowledge and consent triggered the onset of my anxiety attacks and a compulsive disorder (trichotillomania) in 2002.   I discovered the letter from DS instructing Dr. Oraee to submit medical information to the Department so that a determination could be made about my security clearance . . . I concluded from [the letter from DS] that DS was seeking a pretext to end my foreign service career.

(Thompson Aff. ¶ 3.)   Given this admission, it follows that plaintiff would have reached the same conclusion and thus suffered the same adverse effects even if DS had approached her directly with the same request.   Similarly, plaintiff would have suffered this same injury regardless of whether her doctor ever provided the information to be included in the agency's system of records.   (*See* Pl.'s Ex. 49 (E-mail from Thompson to William Irelan, Esq.) ("This whole thing disturbs me very deeply.   D.S. is claiming that my medical condition could result in loss of my

---

[14]/Similarly, plaintiff does not even mention this event in her lengthy and detailed Complaint.

[15]/Plaintiff's affidavit must be viewed with some skepticism in light of the maxim that recoveries in tort for the invasion of privacy are limited to damages only for emotional distress that is "of a kind that normally results from such an invasion and it is normal and reasonable in its extent."   Restatement (Second) of Torts, § 652H cmt. b (1977) (cited in *Doe v. Chao*, 540 U.S. at 634 n.4 (2004)).

security clearance-- another threat by the Department to harm me and further evidence of its malevolent intent.")[16]

In light of plaintiff's lack of sufficient evidence of intent and her failure to draw a connection between the (e)(2) violation (as opposed to her general fear of a vast conspiracy against her within the Department) and any adverse effect, the claim relating to solicitation of medical information cannot be sustained.

## IV.    Informed Consent -- Subsection (e)(3)

### A.    Sufficiency of Warning

Subsection (e)(3) of the Privacy Act requires federal agencies that maintain systems of records to

> inform each individual whom it asks to supply information . . . (A) the authority . . . which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary; (B) the principal purpose or purposes for which the information is intended to be used; (C) the routine uses which may be made of the information . . . ; and (D) the effects on him, if any, of not providing all or any part of the requested information.

5 U.S.C. § 552a(e)(3).  The OMB Guidelines note that "[i]mplicit in this subsection is the notion of informed consent since an individual should be provided with sufficient information about the request for information to make an informed decision on whether or not to respond."  40 Fed. Reg. at 28,961.

Plaintiff argues that the form she signed prior to the interview with Scanlon did not provide her with enough information about the content of the interview or how the information would be used for her to make an informed decision whether to participate.  (*See* Pl.'s Reply at

---

[16] In fact, at the time plaintiff wrote this e-mail regarding her reaction to the Department's letter to her doctor, she was of the view that the doctor had not "respond[ed] because to do so would have violated doctor-patient confidentiality."  (Pl.'s Ex. 49.)

12.)  She claims that she had been told the interview would concern the general office turmoil and mismanagement and that if she had known that the questions would instead concern her relationship with her supervisor, that she was a subject of the investigation, and that the information she provided would be placed in her security file, she would not have consented to the interview.  (*See id*. at 14; Pl.'s Opp'n at 20-21.)  She further asserts that by subjecting herself to the interview, she was "putting her life and recovery of her health at risk."  (Pl.'s Opp'n at 22.)

The warning form stated that: "[t]his is an official administrative inquiry regarding misconduct or improper performance of official duties;" "[t]he purpose of this interview is to obtain information which will assist in the determination of whether administrative action is warranted; to determine suitability for assignments to certain sensitive positions and/or geographic areas; and to permit determination of an individual's suitability for continued employment or fitness for a security clearance;" plaintiff was "going to be asked a number of specific questions regarding the performance of [her] official duties;" plaintiff had "a duty to reply to these questions and agency disciplinary action, including dismissal, may be undertaken if [she] refuse[s] to answer or fail to reply fully and truthfully;" and "the answers [plaintiff] furnish[es] and any information or evidence resulting therefrom may be used in the course of agency disciplinary proceedings which could result in disciplinary action, including dismissal." (Def.'s Mot., Ex. 7.)  The form also provided that "[i]n accordance with the Privacy Act of 1974, [plaintiff is] advised that the authority to conduct this interview is contained in 12 FAM § 228.1;

22 U.S.C. 4802(a)(2)(x) [sic]" and that "[t]his inquiry pertains to Suitability/Misconduct." (*id.*; *see* Def.'s Resp. ¶ 27.)

Although plaintiff does not dispute that the form indicated that the information she provided would be used to determine employee "suitability" for a security clearance, the gravamen of her complaint is that she did not know it would be used to determine her *own* suitability. (*See* Pl.'s Reply, Ex. 7 at 1.) This statement is belied by the e-mail from plaintiff's lawyer informing her that the interview would "focus" on her and her supervisor, (Pl.'s Opp'n, Ex. 39.)[17] Moreover, as discussed below, the agency is not legally required to specifically warn plaintiff that she was a subject of the investigation.

Subsection (e)(3) does not expressly require an agency to tell an individual that she is the subject of an investigation. The question is thus whether such a requirement is inherent in the mandate to inform the interviewee of the "principal purpose" of the interview, 5 U.S.C. § 552a(e)(3)(B), as interpreted by the OMB Guidelines' notion of "informed consent." OMB Guidelines, 40 Fed. Reg. at 28,961. The Court concludes that the Warning and Assurance form supplied by Scanlon was sufficient to meet the agency's (e)(3) obligations, even if the form did not specifically notify her that she had become a subject of the investigation. Plaintiff was clearly warned that the information she provided could be used to determine "an individual's" suitability for continued employment and/or security clearance. (Def.'s Mot., Ex. 7.) Certainly she could infer from this warning that if she provided information revealing misconduct by her,

---

[17]Plaintiff's lawyer advised her: "I should mention that I did get Scanlon to admit that the investigation was focused on you and [your supervisor] and was in response to allegations that there had been some mismanagement of the office in which you and [your supervisor] worked. He did say, however, that he was open to discuss anything and that any allegations you might want to make to him would be included in his report and could lead to further investigations of the concerns you raise." (Pl.'s Opp'n, Ex. 39.)

the agency might use it to make an determination adverse to her.[18/]  *See Beller v. Middendorf*, 632

F. 2d 788, 798 n.6 (9th Cir. 1980) (when plaintiff provided information to the agency "albeit

originally in connection with a check for a top secret security clearance," he "must have known

that information which disclosed grounds for being discharged could be used in discharge

proceedings").  Thus, her information about the interview was "sufficient . . . to make an

informed decision on whether or not to respond."  OMB Guidelines, 40 Fed. Reg. at 28,961.[19/]

Similarly, subsection (e)(3)(C) does not require the level of specificity in disclosure of the

routine uses that plaintiff desires.  Although the warning did not explicitly mention "routine

uses," "[n]othing in the Privacy Act requires agencies to employ the exact language of the statute

to give effective notice."  *United States v. Wilber*, 696 F.2d 79, 80 (8th Cir. 1982).  Furthermore,

the agency need not explain "all of [its] rules and regulations" on "one small form" to meet the

requirements of subsection (e)(3).  *Glasgold v. Sec'y of Health & Human Servs.*, 558 F. Supp.

129, 150 (E.D.N.Y. 1982); *see also Field v. Brown*, 610 F.2d 981, 987 & n.14 (D.C. Cir. 1979)

---

[18/]A different outcome would require the government to determine prior to any witness interview whether the witness might eventually be named as a subject of the investigation.  In many cases, an agency may not know at or the time of the interview precisely how it will use information that is yet to be gathered.  For instance, in this case, if Scanlon had interviewed plaintiff first, he would not have yet considered her a subject and could not have informed her that she would become one.  Accordingly, subsection (e)(3) must be interpreted to permit flexibility so the agency can determine the specific uses for information after it has been gathered.  *See* OMB Guidelines, 40 Fed. Reg. at 28,961-62 ("It was not the intent of [subsection (e)(3)] to create a right the nonobservance of which would preclude the use of information or void an action taken on the basis of that information.").

[19/]Moreover, the Court is unwilling to convert this administrative process into something akin to a criminal investigation by imposing warning requirements similar to those required for targets of a grand jury investigation.  *See* Department of Justice, United States Attorneys' Manual § 9-11.151 ("If the witness is a target, the [advice of rights] should . . . contain a supplemental warning that the witness's conduct is being investigated for possible violation of federal criminal law.").

(notice of possible disclosure to other entities for "review, investigation, administrative action, criminal prosecution, or civil litigation" was sufficient).  The very uses of the information to which plaintiff specifically objects (*i.e.*, giving it to the OCR and the FSGB and placing it in her security file (Pl.'s Opp'n at 21)), can be reasonably inferred from the warning given.  (Def.'s Mot., Ex. 7 (stating information would be used "in the determination of whether administrative action is warranted . . . and to permit determination of . . . fitness for a security clearance").)[20]

## V.      Necessary to Accomplish a Purpose of the Agency -- Subsection (e)(1)

Plaintiff has also failed to demonstrate that defendant violated subsection (e)(1) of the Privacy Act, which requires federal agencies that maintain systems of records to "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President."  5 U.S.C. § 552a(e)(1).  This subsection is not violated so long as the maintenance of the information at issue is relevant and necessary to accomplish a legal purpose of the agency. *See Reuber v. United States*, 829 F.2d 133, 138-39 (D.C. Cir. 1987).

Plaintiff argues that the investigation did not serve any purpose of the Department because "her suitability was [never] put in question", the "alleged 'romantic relationship' . . . does not *per se* involve a question of suitability", and "[n]o one alleged that Plaintiff was guilty

---

[20]Plaintiff also argues that the form's indication that she would be asked about her "official duties," when she was in fact asked about a personal relationship, represents a violation of subsection (e)(3).  But the limited provisions of subsection (e)(3) do not include a requirement that the government inform interviewees of the content of the interview. *See* 5 U.S.C. § 552a(e)(3).  Similarly, plaintiff's argument that the form did not cite the proper authority in violation of subsection (e)(3)(A) lacks support.  Plaintiff admits that the authority cited "is tied specifically to suitability and security clearances," but she argues that the "actual interview was about neither."  (Pl.'s Opp'n at 20.)  As explained *infra* Section V, the investigation, including the interview of plaintiff, was clearly geared to the issue of suitability.

of any prohibited personnel practices." (Pl's Opp'n at 24, 25.)  However, the requirements of

subsection (e)(1) are not so rigid.  The information maintained need only be "*relevant and*

*necessary* to accomplish *a* purpose of the agency." 5 U.S.C. § 552a(e)(1) (emphasis added).  The

Department is required by statute to ensure that the Foreign Service is "free from any personnel

practice prohibited by section 2302 of Title 5." 22 U.S.C. § 3905(b)(4).  Prohibited personnel

practices include "grant[ing] any preference or advantage not authorized by law, rule, or

regulation to any employee . . . for the purpose of improving or injuring the prospects of any

particular person for employment." 5 U.S.C. § 2302(b)(6).  Maintenance of information

concerning whether plaintiff's supervisor provided unfair employment advantages to her is

clearly "relevant and necessary" to achieving this purpose.  The details of the relationship are

"relevant and necessary" to determining whether any advantages were given to plaintiff and

whether they were "authorized by law" or "for the purpose of improving" plaintiff's employment

prospects. *Id*.  While an agency normally would have no reason to maintain information on an

employee's personal relationships, in these circumstances plaintiff's relationship was inextricably

linked with allegations of favoritism by her supervisor.  And though plaintiff argues that

Scanlon's "investigative focus" was "more prurient than professional" (Pl.'s Opp'n at 28), the

contents of the ROI belie this claim.  Scanlon questioned witnesses as to the existence of an

"affair," but gave equal, if not greater, attention to employees' observations of the relationship's

impact on the office and whether the relationship unfairly benefitted plaintiff.[21]  Thus, it was

_____

[21]/Scanlon's efforts to investigate the core allegations, as opposed to the mere existence of
a romantic relationship, are too numerous to detail.  Most of his interview reports contain a
paragraph or two concerning evidence of a relationship between plaintiff and her supervisor,
followed by numerous paragraphs regarding the issues directly relevant to the agency's purpose.
(*See, e.g.*, ROI at 6, 16 (perceptions of favoritism) and 10, 13 (adverse impacts on the office).)
Even a brief perusal of the ROI shows that plaintiff's claim that Scanlon was "only tangentially

proper for defendant to maintain the information in the ROI.[22]

## VI.    Maintenance of Accurate Records -- Subsection (e)(5)

The Department is obligated to "maintain all records which are used by the agency in

making any determination about an individual with such accuracy . . . as is reasonably necessary

to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5). Plaintiff claims

that "[b]ased on false or inaccurate information compiled by FMP/EX [i.e., the memoranda

prepared by her coworkers],[23] . . . Defendant made an adverse determination about Plaintiff

removing her, not temporarily but permanently from her IFS position." (Pl.'s Reply at 18.)

_____

interested in the core issue of favoritism" (Pl.'s Opp'n at 28) would fail to convince any
reasonable jury.

[22]A secondary argument in plaintiff's pleadings casts her claim in a slightly different
light-- that it is the length of time that the agency has and will maintain files on the investigation
that is of concern.  For example, she asserts that "[t]here was no reason for Defendant to have
maintained this information about Plaintiff or to have questioned her about it a full 18 months
later" during plaintiff's five-year security update.  (Pl.'s Opp'n at 28.)  But the record shows that
plaintiff was questioned not about the ROI, but about the Letter of Admonishment.  (*See id.*, Ex.
29 at 3.)  It is entirely reasonable that this letter should remain in the agency's file.  Plaintiff's
inappropriate use of office e-mail is obviously relevant to the agency's purpose of ensuring that
its employees comply with governing rules and regulations.  Moreover, the agency apparently
only maintained the letter for the limited period of one year and it was "not . . . placed in
[plaintiff's] Official Performance Folder," but rather in the Office of Employee Relations.  (*See*
Def.'s Mot., Ex. 12 at 2.)  Even assuming that the ROI remains in plaintiff's security file,
plaintiff does not provide any evidence that the July 2003 questioning allegedly based on this
information had an adverse effect on her or resulted in "actual damages."  She states, "The fact
that questions were asked within earshot of an office colleague seemed calculated, in my view, to
diminish my standing in a new office where I had begun working only weeks earlier."
(Thompson Aff. ¶ 5.)  Because she provides no evidence that anyone actually overheard the
conversation or that the questioning had any other repercussions, her claim must fail.  (*See*
Thompson Dep. at 187-88 (stating only that plaintiff's colleague was in a room adjoining
plaintiff's office during the interview).)

[23]Plaintiff also claims that FMP elicited "speculative, prejudicial information from a third
party alone" by inquiring about the personal photos she had allegedly sent to her supervisor.
(Pl.'s Opp'n at 30.)  However, she points to no inaccurate *record* relating to the photos on which
to base a claim under subsection (e)(5).

While an agency may not "squirrel away, deliberately or out of bureaucratic habit, unsubstantiated rumors, McCarthyesque innuendo, [or] unchecked reports of dubious informers or prying neighbors," *Blazy v Tenet*, 979 F. Supp. 10, 20 (D.D.C. 1997), plaintiff's Privacy Act claim in this case is entirely misguided.  To make out a damages claim, the alleged adverse determination must result from the inaccuracy of the records, not the mere existence of the records.  *See Murphy v. United States*, 167 F. Supp. 2d 94, 97 (D.D.C. 2001).  Plaintiff would need to show not only that the inaccurate records were considered in making the determination, but that an error in the records *caused* the determination.  *See Hughley v. Fed. Bureau of Prisons*, No. 94-1048, slip op. at 4-5 (D.D.C. Apr. 30, 1996).

Plaintiff claims that she is entitled to damages because inaccuracies in the documents provided by her coworkers to FMP led to the agency's "adverse determination" to assign her to duty outside of IFS.  (Pl.'s Opp'n at 29.)  But plaintiff has not shown that any errors in agency records *caused* this personnel action.  Though she points to meeting notes to show that Department executives considered her coworkers' allegations (*see* Pl.'s Opp'n, Ex. 11), there is no evidence that the decisionmakers gave these statements any credence.  Instead, the agency undertook an investigation with the goal of ferreting out inaccuracies.  Contrary to plaintiff's argument, the temporary reassignment was merely an incidental effect of the decision to initiate an investigation.  (*See, e.g.*, Pope Dep. at 54-55.)[24/]  If the Court were to find a violation of subsection (e)(5) in these circumstances, it would discourage agencies from taking steps to substantiate or disprove documented rumors of misconduct, for under plaintiff's proposed

---

[24/]Plaintiff disputes that the investigation was the true reason for her reassignment, but her theory of the agency's motivation does not state a violation of subsection (e)(5) either.  By plaintiff's account, her superiors' decision was not based on any inaccuracy in their records, but rather on their desire to "leave her without a job."  (Pl.'s Reply at 17.)

approach, an agency could be held liable upon doing so if its investigation has an incidental adverse effect on an employee and then reveals that the rumors were "inaccurate."

Moreover, even if all the claimed inaccuracies are deleted from the memos, the allegations were serious enough for the agency to reasonably conclude that an investigation and a temporary detail were necessary.  (*Compare* Pl.'s Opp'n at 30 and Ex. 42 (listing alleged inaccuracies) *with* Coworker 1 Mem., Coworker 2 Mem.)[25]   According to FMP's Executive Director, the two coworkers "were going totally apoplectic" about the situation and would not be appeased until their concerns were addressed.  (Todd Dep. at 42.)  Once the decision was made to undertake an investigation, plaintiff's detail naturally followed.  (*See* Pope Dep. at 54-55 (stating that temporary detail for employees under investigation was standard practice).)  Furthermore, plaintiff, her doctor, and her lawyer had repeatedly requested that plaintiff not be subjected to a stressful work environment.  (*See* Def.'s Reply, Exs. 4 and 5; Pl.'s Opp'n, Ex. 34.)

Thus, plaintiff has failed to offer evidence to show that it was the alleged inaccuracies -- and not these other concerns -- that led to her removal from IFS.  Rather, as argued by defendant, "it was the *fact* that allegations were made at all that formed the basis for separating the employees."  (Def.'s Reply at 18 (emphasis in original).)  Additionally, although plaintiff clearly hopes to persuade the Court to review the reasonableness and duration of her removal from IFS, "the Privacy Act was not intended to shield [federal] employees from the vicissitudes of federal personnel management decisions," *Albright*, 732 F.2d at 190.  The Court must therefore grant summary judgment in favor of defendant on this claim.

---

[25]/For example, the insinuation that her supervisor accompanied plaintiff on business trips or "temporary duty" for personal reasons, using federal funds to do so, is obviously serious enough to warrant further inquiry.  (*See* Coworker 2 Mem. at 3.)

**VII.    Dissemination of Record to Those With a Need to Know Within Agency --**
**Subsection (b)(1)**

Subsection (b) of the Privacy Act proscribes the disclosure of records contained within a

system of records, subject to twelve exceptions.  *See* 5 U.S.C. § 552a(b).  One of these

exceptions is disclosure of the record "to those officers and employees of the agency which

maintains the record who have a need for the record in the performance of their duties."  5 U.S.C.

§ 552a(b)(1).  This provision, which is based on a concept of "need to know," authorizes the

intra-agency disclosure of a record for necessary, official purposes.  *See* OMB Guidelines, 40

Fed. Reg. at 28,954 ("It is recognized that agency personnel require access to records to

discharge their duties.").  Plaintiff claims that the disclosure of the ROI to Barbara Pope in the

OCR violated these provisions because OCR had no need for the information.  (Pl.'s Opp'n at

32-33.)  However, the Court finds that the disclosure was proper because OCR had a legitimate

need for the records in the performance of its duties, or alternatively, it did not constitute an

intentional or willful violation of the Privacy Act.

Authority over EEO programs has been delegated to the Assistant Secretary for Civil

Rights and OCR is responsible for promoting and maintaining a workplace free from

discrimination and harassment.  (*See* Def.'s Mot., Ex. 19 ¶¶ 2-3.)  Plaintiff contends that OCR

did not need to know information concerning the DS investigation because no formal or informal

complaint of discrimination or sexual harassment had been made.  (*See* Pl.'s Opp'n at 34.)

While admittedly no employees filed a complaint, this argument fails as a matter of law.  OCR's

"need to know" about the results of the investigation existed even in the absence of a complaint

because the subject of the investigation -- whether plaintiff's supervisor was promoting

plaintiff's career to the detriment of the office and other employees because of a romantic relationship -- was relevant to the agency's compliance with EEO regulations.  First, if plaintiff had been granted employment benefits because she submitted to her supervisor's sexual advances, defendant may have been liable for unlawful sex discrimination against the complaining witnesses who were denied the benefits.  *See* 29 C.F.R. § 1604.11(g).[26]  Similarly, defendant could be exposed to liability for sexual harassment of plaintiff by her supervisor if, for instance, plaintiff later alleged that her supervisor had used his supervisory position to pressure her into entering a relationship with him.  *See* 29 C.F.R. § 1604.11(a).  The possibility of these violations was sufficient to justify the disclosure to the OCR because OCR must "identify . . . discriminatory practices and policies."  29 C.F.R. § 1614.102(a); *see also* 29 C.F.R. § 1604.11(d) ("an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action").  (*See also* Def.'s Mot., Ex. 19 ["Caramanica Decl."].)  Thus, the information concerning the DS investigation was properly disclosed to the OCR.

In any event, plaintiff has presented no evidence that the disclosure to the OCR was an intentional or willful violation of the Privacy Act.  Plaintiff acknowledges that employees had complained to the OCR about the situation in FMP involving plaintiff and her supervisor.  (*See* Pl.'s Resp. to Def.'s Rule 7(h) St. ¶ 30.)  According to plaintiff, Pope "ordered up the

---

[26]Plaintiff points out that a claim of sex discrimination based on favoritism to a sexual partner may not always be cognizable.  (*See* Pl.'s Opp'n at 34 (quoting EEOC Notice No. 9150-048) ("An isolated instance of favoritism toward a 'paramour' may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders.").)  However, the allegations about plaintiff's supervisor were based on much more than an "isolated instance."

investigation" and it was conducted at "the behest of Ms. Pope" in the OCR.[27/]  (*See* Pl.'s Reply

at 19.)  Pope also participated in plaintiff's reassignment pending the outcome of the

investigation.  (*See* Pope Dep. at 53-55.)  Clearly, Pope was involved at every stage leading up to

the investigation.  It was thus reasonable -- and, considering the possibility that the Department

could be liable, prudent -- for DS to disclose the results of the investigation to OCR.  The

disclosure therefore does not constitute an intentional or willful violation of the Privacy Act.[28/]

## VIII.   Dissemination of Record Outside Agency -- Subsection (e)(6)

Subsection (e)(6) of the Privacy Act requires federal agencies that maintain systems of

records to, "prior to disseminating any record about an individual to any person other than an

agency, . . . make reasonable efforts to assure that such records are accurate, complete, timely,

and relevant for agency purposes."  5 U.S.C. § 552a(e)(6).  The statutory language makes clear

that this provision does not apply when information is disclosed within the agency or to another

agency.  *See* OMB Guidelines, 40 Fed. Reg. at 28,965 ("[A]ny record disclosed to a person

outside the agency (*except another agency*) must be as accurate as appropriate for purposes of the

agency which maintained the record.") (emphasis added); *see also Perry v. FBI*, 759 F.2d 1271,

1275 (7th Cir. 1985).  Plaintiff contends that the dissemination of the ROI to FSGB pursuant to

---

[27/]Plaintiff further alleges that Pope "had no *legitimate* business involving herself in a [DS] investigation" by ordering it to take place and that "[DS] had no legitimate business investigating unsubstantiated allegations of an office 'affair.'"  (Pl.'s Reply at 18-19 (emphasis in original).)  The Court does not address these claims as they do not allege a Privacy Act violation.

[28/]Pope's deposition statement that she did not "have a need" for the ROI is irrelevant to the question of whether OCR as a department had a need for it. (*See* Pope Dep. at 48.)  Given the declaration of Janice Caramanica, Senior Attorney-Advisor for the OCR, which attests to the OCR's "need to know" the outcome of the DS investigation (Caramanica Decl. ¶ 4), Pope's ambiguous deposition testimony that she did not "have a need" for the ROI can provide little, if any, solace to plaintiff.

the grievance process violated subsection (e)(6), but since the Court finds that the FSGB is an "agency" under the Privacy Act, plaintiff cannot prevail.

The Privacy Act adopts the definition of "agency" used in the Freedom of Information Act, *see* 5 U.S.C. § 552a(a)(1), which in turn references the definition used in the Administrative Procedure Act. *See id.* § 552(f). Thus, an agency is "each authority of the Government of the United States," *id.* § 551(1), and "includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." *Id.* § 552(f)(1). *See Dong v. Smithsonian*, 125 F.3d at 878-79. The FSGB clearly falls within this definition. Its members are appointed by and may be removed by the Secretary of State, and its facilities, services, and supplies are funded by the Department. *See* 3 FAM §§ 4441, 4443, 4445. At the request of the FSGB, employees of the Department may be assigned as FSGB staff. *See id.* § 4445. The FSGB has authority to decide grievance appeals for employees of four foreign service agencies and promulgates its own rules and regulations. 22 U.S.C. § 4136. Thus, although Board members are not federal employees, *see* 3 FAM § 4442, the Court finds that the Board is nevertheless an "establishment in the executive branch of Government." 5 U.S.C. § 552(f)(1). Furthermore, the FSGB does its own reporting in the Federal Register pursuant to subsection (e)(4) of the Privacy Act. (*See* Pl.'s Reply, Ex. 17.) As that subsection only applies to "each agency that maintains a system of records," 5 U.S.C. § 552a(e), the Court must conclude that the FSGB is an "agency" under the Privacy Act.

This conclusion is consistent with the law of this Circuit. In *Dong*, the Court held that the Smithsonian was not an "establishment in the executive branch of government," a

"Government-controlled corporation," or an "authority of the Government of the United States"
under the Privacy Act because, *inter alia*, its governing Board members are appointed by
Congress or are members of Congress themselves, the institution does not "administer[] federal
statutes . . . promulgate[] rules and regulations (other than with respect to its own buildings and
grounds) . . . [,] engage[] in any other typically executive activity, [or] . . .determine rights and
duties through adjudication."  125 F.3d at 879, 882.  In the case of the FSGB, each of these
factors points in the opposite direction: the FSGB consists of members appointed exclusively by
an executive department, administers federal statues, promulgates regulations, and adjudicates
the rights of individuals.  Thus, it is part of the executive branch and, consequently, an "agency"
for purposes of the Privacy Act.  *Cf.* 22 U.S.C. § 4140 (actions of the FSGB are judicially
reviewed pursuant to 5 U.S.C. § 706, which provides the scope of review for agency actions);
*Egan v. United States Agency for Int'l Dev.*, 381 F.3d 1, 5 (D.C. Cir. 2004) (the FSGB's refusal
to grant reconsideration is "committed to agency discretion by law").

Because plaintiff has failed to provide any evidence that the ROI was disseminated to any
person other than an agency, the Court grants summary judgment to defendant with respect to
subsection (e)(6).

**IX.    Safeguards to Privacy -- Subsection (e)(10)**

Subsection (e)(10) of the Privacy Act requires federal agencies that maintain systems of
records to

> establish appropriate administrative, technical and physical safeguards to insure
> the security and confidentiality of records and to protect against any anticipated
> threats or hazards to their security or integrity which could result in substantial
> harm, embarrassment, inconvenience, or unfairness to any individual on whom
> information is maintained.

5 U.S.C. § 552a(e)(10).  Plaintiff alleges that defendant violated this provision when "[a] copy of the ROI and suspension letter were delivered to [her] when she was absent from the office," and "these materials were left on her chair in an open cubicle."  (Second Am. Comp. ¶¶ 32-33.) Defendant maintains that plaintiff gave Cheryl Coviello permission to leave the materials in her empty office (*see* Coviello Decl. ¶ 5), while plaintiff disputes that account. (Thompson Dep. at 174-75.)  Plaintiff further asserts that the "possibility that someone working in the vicinity of my desk had read embarrassing, private information about me made my being able to function in the building impossible.[29]  More and more frequently I had to leave the premises in order to prevent the onset of a panic attack."  (Thompson Aff. ¶ 5.)

The Court need not resolve whether this assertion is sufficient evidence of a causally linked "adverse effect" or "actual damages" because Coviello's conduct does not satisfy subsection (g)(4)'s high standard of culpability.[30]  Even assuming that Coviello did not have permission to leave the ROI on plaintiff's chair, her effort to deliver the ROI to Thompson was in no way "patently egregious."  *Laningham*, 813 F.2d *Id.* at 1242 (internal quotation omitted).  *See also, e.g.*, *Henson v. Brown*, Civ. No. 95-213, slip op. at 5-7 (D. Md. June 23, 1995) (disclosure of medical records in response to subpoena signed by judge to attorney for plaintiff's ex-wife, rather than to court, did not "constitute an extreme departure from the standard of ordinary

---

[29]Although this factual dispute is relevant to whether defendant adequately protected against a threat to the confidentiality of the ROI, the issue does not preclude summary judgment because, as discussed below, no reasonable jury could conclude that Coviello acted "in a manner that was intentional or willful."  5 U.S.C. § 552(g)(1)(D).

[30]Moreover, courts generally dismiss claims under subsection (e)(3) where there is no evidence, as is the case here, that the records at issue were in fact "leaked."  *See, e.g.*, *McCready*, 297 F. Supp. 2d 178,197 (2003); *Pilon v. United States Dep't of Justice*, 796 F. Supp. 7, 13 (D.D.C. 1992).

care").  While it was perhaps not prudent for Coviello to leave the materials unsecured in

Thompson's absence, she could reasonably have believed that plaintiff would pick up the

documents and had no reason to think that curious co-workers would invade Thompson's privacy

by perusing documents that were clearly meant for Thompson alone.  Although the binders of

supporting documents were not sealed, it is undisputed that the ROI "was in a sealed envelope

that was addressed to Ms. Thompson and clearly marked 'To Be Opened Only by Addressee,' or

words to that effect."  (Coviello Decl. ¶ 4; *see* Thompson Dep. at 175.)  Nor does Coviello's

failure to follow agency recommendations to take the further precaution of keeping confidential

information in a "locked file cabinet," 5 FAM § 462(a)(7), necessarily demonstrate an intentional

violation.  *See Dickson v. Office of Pers. Mgmt.*, 1991 WL 423968, at **16-17 (D.D.C. Aug. 27,

1991) ("mere negligence" due to "fail[ure] to follow internal guidelines" is not enough to show

willfulness).  In short, though plaintiff's version of the facts suggests that Coviello did not take

all the precautions she might have to protect plaintiff's privacy, a reasonable jury could not find

that this failure amounted to a reckless disregard of plaintiff's rights.

## CONCLUSION

For the reasons stated above, the Court finds that plaintiff has failed to present evidence

to support her Privacy Act claims, and therefore, it grants defendant's motion for summary

judgment.[31/]  A separate order accompanies this Memorandum Opinion.

---

[31/]Given the Court's conclusion that plaintiff's seven Privacy Act claims cannot survive
summary judgment, it need not address defendant's additional arguments that plaintiff has failed
to show an "adverse effect" or "actual damages" caused by a Privacy Act violation (*see* Def.'s
Mot. at 42-43; Def.'s Reply at 23-31.)

_____s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   August 31, 2005 *nunc pro tunc*